## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LAURA NIEWENHOUS,        *

     Plaintiff,          *

v.                    *       Case No.: DLB-20-231

NATHANIEL BURNS, *et al.*,    *

     Defendants.      *

          *   *   *   *   *   *   *

RICHARD DELAVEGA,      *

     Plaintiff,          *

v.                    *       Case No.: DLB-20-232

NATHANIEL BURNS, *et al.*,    *

     Defendants.      *

*   *   *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM OPINION AND ORDER

Richard Delavega, the owner of Mid Atlantic Wellness Pain Management Center ("Mid Atlantic Wellness"), and Laura Niewenhous, a certified registered nurse practitioner he employed, were arrested for keeping a common nuisance, based on the alleged unlawful distribution of oxycodone[1] and other Schedule II controlled dangerous substances at Mid Atlantic Wellness, an alleged "cash for prescription operation."  After the criminal charges against them were dismissed for lack of probable cause by a state court judge at a preliminary hearing, plaintiffs filed lawsuits

---

[1] Oxycodone, as an opioid pain medicine, is a "Schedule II drug[], a designation indicating that the drugs have both a 'currently accepted medical use' but also a 'high potential for abuse.'" *Harris v. State*, No. 745, Sept. Term 2018, 2019 WL 4928640, at *2 (Md. Ct. Spec. App. Oct. 7, 2019) (quoting Md. Code Ann., Crim. Law § 5-403(b)(1)(viii), (xiii), (xvi), (xviii), (f)).

against the lead investigator, Detective Steven Gore, and other members of the Queen Anne's County Sheriff Deputies and the Maryland State Police. They claim that the defendants fabricated probable cause to falsely and illegally obtain the arrest warrants and that their arrests without probable cause violated their Fourth Amendment rights, their state constitutional rights, and Maryland common law.

The cases were consolidated for pretrial purposes, and defendants filed motions to dismiss both complaints on various grounds or alternatively, for summary judgment. The Court will treat defendants' motions as motions for summary judgment. Because the undisputed facts establish that defendants had probable cause for plaintiffs' arrest and are entitled to qualified immunity from the federal claims, the Court will grant summary judgment in defendants' favor as to the federal claims and dismiss the state claims for lack of jurisdiction.

## I. Background[2]

### A. The Investigation

The investigation into Mid Atlantic Wellness began in the Spring of 2016. At that time, "numerous pharmacies in Chester and Stevensville Maryland" contacted Detective Gore, a member of the Queen Anne's County Drug Task Force, "in reference to patients attempting to fill prescriptions written from Mid Atlantic Wellness," a pain management clinic. Gore Decl. & Report, ECF 27-3, at 8. The pharmacists stated that "the patients were from out of state and always seemed to be in a hurry, more so than average customers," and the pharmacists questioned whether "Mid Atlantic Wellness was a legitimate business or a pill mill."[3] *Id.* The pharmacists "[a]ll . . .

---

[2] This background presents the undisputed facts. *See* Fed. R. Civ. P. 56(a).

[3] A "pill mill" is a clinic "where doctors, in exchange for cash, prescribed large dosages of controlled substances like oxycodone to patients with no legitimate medical need." *United States v. Crittenden*, 716 F. App'x 142, 143 (4th Cir. 2017).

advised [Gore] that they would not be filling the prescriptions from Mid Atlantic Wellness at th[at] time due to their concerns." *Id.*  Additionally, other tenants in the building where Mid Atlantic Wellness was located had complained that "persons who were visiting Mid Atlantic Wellness were sleeping, urinating, fighting and creating disturbances in the parking lot, bathrooms and hallways shared with other tenants."  App. for Stmt. of Charges 2, ECF 27-2.

Detective Gore learned through DEA investigators that, before opening Mid Atlantic Wellness, Richard Delavega "was a 'recruiter' for [a] 'pill mill' in Salisbury."  Report, ECF 27-3, at 10.  Delavega "had operated several other pain management clinics," including one in Salisbury that "was shut down by the DEA in 2015 for illegally selling prescription pain pills."  *Id.* at 12. After the DEA closed that clinic, Delavega "moved his pain management operation to Queen Anne's County Maryland" and "lure[d] [the Salisbury clinic patients] into his new location," which "was only open on weekends."  *Id.*  He then closed that clinic and opened Mid Atlantic Wellness at 101 Log Canoe Circle, Suite E in Stevensville, Maryland.  *Id.* at 13.

In July 2016, Detective Gore began an investigation into Mid Atlantic Wellness for the Queen Anne's County Drug Task Force.  App. for Stmt. of Charges 2.  He consulted with the State's Attorney's Office throughout the investigation.  Gore Decl. ¶ 5, ECF 27-3.  Mid Atlantic Wellness's office at 101 Log Canoe Circle was "on the second floor of an office building in a business park."  App. for Stmt. of Charges 2.  It "share[d] stairwells, entry lobbies, restrooms and parking" with the other businesses in the building.  *Id.*  Detective Gore determined that "Mid Atlantic Wellness was not a registered business in Maryland" and appeared to be operating "without the appropriate and required business licenses for the State of Maryland."  Report, ECF 27-3, at 7.

Detective Gore conducted surveillance and "immediately observed multiple vehicle[s] with out of state license plates in the parking lot" and "persons sitting in their vehicles for hours on end, persons sleeping in their vehicles and persons milling around the parking lot and common areas, all of whom were waiting to be seen by Mid Atlantic Wellness."  App. for Stmt. of Charges 2.  Detective Gore stated that he "contacted a patrol officer to make contact with one of the persons sitting in their car and this drew an immediate and hostile reaction from employees working at Mid Atlantic Wellness, who immediately began threatening physical harm to neighboring tenants and management for the business park."  *Id.*

Detective Gore continued the surveillance and investigation from July through December 2016.  *Id.* at 3.  During the investigation, it was observed that Mid Atlantic Wellness often "was not open during the[] normal business hours [of 9 a.m. to 5 p.m.] and not open all five business days," but rather "would open at random times of the day and evening."  Report, ECF 27-3, at 8; *see also id.* at 13.

Detective Gore "interviewed management for the building and other tenants" and learned that "the patients waiting to be seen had been causing multiple disturbances ever since the clinic had opened"; the other tenants' complaints continued throughout the surveillance period.  App. for Stmt. of Charges 2–3.  When management informed "persons working for Mid Atlantic Wellness" of the other tenants' complaints, they responded "with hostility and threats of lawsuits for harassment."  *Id.* at 2.

Detective Gore's

> investigation revealed that Mid Atlantic Wellness advertised through word of mouth and on Facebook. They were only open certain days and to be seen required a $350.00 initial cash payment with each subsequent visit costing $275.00. The clinic will not take insurance and only accepts cash payments. A subscriber search of the phone number associated to the clinic has no legitimate subscriber information. When making an appointment on Facebook you are asked if you want

> to see Rick or Laura. Further investigation revealed that the clinic is owned by Richard Edward Delavega and that he is not a doctor. Richard Delavega employs Laura Carol Niewenhous who is a CRNP, Certified Registered Nurse Practitioner and the one who can legally write prescriptions from Mid Atlantic Wellness and a secretary named Christina Saldana.

*Id.* Clinic records showed that appointments were with "Rick" or "Laura Niewenhous." Report, ECF 27-3, at 34–36.

As part of the investigation, an undercover investigator ("UI") "made several visits to the clinic." App. for Stmt. of Charges 3. The UI scheduled an initial appointment with Niewenhous for July 13, 2016. Report, ECF 27-3, at 18. Mid Atlantic Wellness requested that he bring an MRI, which he did. *Id.* at 17–18. The DEA had manufactured the MRI to reflect that the patient "was a healthy male with normal wear on his body for a 35-40 year old male." *Id.* at 17. Niewenhous examined the UI and wrote a prescription for 15 mg oxycodone twice per day plus 10 mg oxycontin twice per day, along with a prescription for naloxone in case of overdose. *Id.* at 19–21. She noted that 30 mg was "a high dose" and "a red flag" for the DEA. *Id.* at 20–21.

On August 9, 2016, the UI returned and after "very brief" consultation, Niewenhous wrote the same prescription. Report, ECF 27-3, at 22. On September 6, 2016, the UI had his next appointment. *Id.* at 23. He was directed to take his own blood pressure. *Id.* He did not receive a physical examination, and Niewenhous wrote him the same prescription. She stated that she would increase it if he obtained laboratory results showing his liver was handling the medication. *Id.*

On October 4, 2016, the UI visited the clinic again and once again took his own blood pressure. *Id.* at 27. He informed Niewenhous that he needed more medication and stated that he was taking additional pain medication that he received "from friends." *Id.* at 29. Niewenhous cautioned him that it was "a violation of [his] pain contract" to take medication not prescribed to him. *Id.* Even so, she increased his oxycontin prescription from 10 mg to 15 mg pills per day. *Id.* at 30.

On November 2, 2016 the UI returned to Mid Atlantic Wellness and once again took his own blood pressure.  Report, ECF 27-3, at 36.  The receptionist, Saldana, stated that Niewenhous was "legit with her shit" and that was "how [the clinic] stay[ed] open."  *Id.* at 37.  Niewenhous gave the UI a physical examination and increased his prescription to three 15 mg oxycodone pill per day, plus two 15 mg oxycontin pills per day.  *Id.* at 37–39.  On December 7, 2016, the UI had his last appointment with Niewenhous.  *Id.* at 39.  She again prescribed three 15 mg oxycodone pill per day, plus two 15 mg oxycontin pills per day.  *Id.* at 42.

### B.  Application for Statement of Charges and Arrest Warrants

On January 26, 2017, Detective Gore submitted an application for statement of charges against Niewenhous and Delavega.  The State's Attorney's Office reviewed and approved the application before he submitted it.   Gore Decl. ¶ 5.  He described Mid Atlantic Wellness's operations, which involved cash payments, word of mouth referrals, appointments scheduled on Facebook with Delavega as an option even though he could not prescribe medication, limited hours, and no legitimate phone number.  App. for Stmt. of Charges 2.  He summarized his six months of surveillance, including the out-of-state patients waiting for hours in the parking lot for appointments at the clinic and loitering on the premises and the complaints from other tenants.  *Id.* at 2–3.  He described the UI's visits to the clinic:

> On each visit [the investigator] paid cash and was given a rudimentary examination and received a prescription for Schedule II narcotics. During these visits he spoke with the other patients and learned that they were all driving one to two hours or more to reach the clinic in an attempt to obtain prescriptions of Schedule II narcotics that they intended to abuse or sell. The undercover investigator was able make several hand to hand purchases from patients from the clinic, further highlighting the fact the clinic was being visited almost exclusively by persons using and distributing Schedule II narcotics and that the Mid Attlantic [sic] Wellness management was fully aware of this fact. One of these hand to hands was made right in the waiting room of the clinic.
>
> During the undercover investigator['']s visits to Mid Atlantic Wellness, Christina Saldana would commonly change the undercover officers blood pressure

readings on his medical chart, in an attempt for U/C to obtain a higher count of Schedule II prescription medications. Christina Saldana would also frequently write an increased pain level on the undercover officers [sic] medical chart, again in an attempt for the undercover officer to obtain a higher count of Schedule II prescription medications. Christina Saldana would continuously ask the undercover officer if he knew anyone that was eligible for pain management and offer a discount on the undercover officer's next visit if he was able to provide Mid Atlantic Wellness with additional customers.

During multiple visits to Mid Atlantic Wellness, when the undercover investigator was seen by Laura Niewenhous, she did not physically examine the undercover officer. Niewenhous would frequently only ask the undercover officer very mundane questions about his employment home life and other very general questions, not relating to or pertinent to his injury or pain level.

*Id.* at 3.

In the application, Detective Gore stated that, based on his "training, knowledge and prior experience," he "immediately recognized Mid Atlantic Wellness as a 'cash for prescription operation' of the type that attracts drug addicts and dealers from out of the area." App. for Stmt. of Charges 3. He explained how a "cash for prescription operation" typically works:

The[] "patients" are required to pay cash, receive a rudimentary examinations [sic] and then receive prescriptions for schedule II narcotics. I also know from my training, knowledge and prior experience that persons visiting these clinic[s] often do so because of the ease of obtaining prescriptions for Schedule II drugs like Oxycodone, that they intend to abuse and/or sell for a profit. I know that these "patients" will often conduct drug sales right in the clinic while waiting to receive new prescriptions and that they always cause quality of life problems for neighbors of the clinic. I also know these clinics open in a location, operate for a short period of time until they draw too much attention to themselves and then they move to another location.

*Id.*

Detective Gore stated that he "observed [a] continuing course of conduct" from July through December 2016 that involved clinic patients waiting in cars, the parking lot, and common area and causing disturbances to other tenants' quality of life. *Id.* Additionally, Niewenhous frequently performed "very basic examinations" when the undercover investigator saw her. *Id.* He stated that "[i]nvestigators believe these very basic examinations only solidify the fact that

Richard Delavega, Laura Niewenhous and Christina Saldana are continuing to operate a frivolous practice at Mid Atlantic Wellness." *Id.* From his investigation, he concluded that "Richard Delavega, Laura Niewenhous and Christina Saldana, all operating under Mid Atlantic Wellness have continuously maintained a common nuisance for the illegal distribution of Controlled Dangerous Substances in violation of CR 5-605(a)92) [sic] and have operated the clinic for profit fully knowing the problems they were causing their legitimate neighbors." *Id.*

On January 26, 2017, based on the application for statement of charges, a state court judge signed the warrants for Delavega, Niewenhous, and Saldana's arrest. Delavega Warrant & Stmt. of Charges, ECF 27-4, at 2–3; Niewenhous Warrant & Stmt. of Charges, ECF 27-4, at 4–5; Defs.' Mem. 9, ECF 27-1. On January 31, 2017, Defendant Burns arrested Niewenhous and TFC Waddell arrested Delavega pursuant to warrants that Defendant Gore obtained. Niewenhous Compl. ¶ 14; Delavega Compl. ¶ 15; Defs.' Mem. 9.[4]

### C. Preliminary Hearing

On April 3, 2017, the state court held a preliminary hearing on Niewenhous's charges. Apr. 3, 2017 Hr'g Tr., ECF 27-6. The State's Attorney argued "the CDS was distributed illegally in two ways, one by drug dealers in the lobby . . . ." Apr. 3, 2017 Hr'g Tr. 46:21–22, ECF 27-6. The second illegal CDS distribution was that Niewenhous herself was "not legally distributing them." *Id*. at 50:11–12.

The court noted that, for a common nuisance charged based on illegal drug sales by someone other than Niewenhous, the State would have to show that Niewenhous was aware of the sales. *Id*. at 47:7–14. The State's Attorney agreed that the sales on their own would not be sufficient for a charge against Niewenhous but contended that, "in this situation, that's not the only

---

[4] Saldana also was arrested, but she is not a part of this lawsuit. Defs.' Mem. 9.

thing," because there also were "complaints from the other tenants which is subsequently observed by the officers as to all these ancillary things outside, in addition to the investigation of the undercover." *Id*. at 47:8–20.  The State's Attorney argued that the court could find Niewenhous had sufficient knowledge "by putting it all together," including that Niewenhous was "not legally distributing them." *Id*. at 48:19–49:4, 50:11–12.  The State's Attorney argued that expert testimony demonstrated Niewenhous's "prescriptions were illegal," but when the court observed that the expert said he did not know whether Niewenhous was prescribing illegally, *id*. at 50:23–25, the State's Attorney conceded that the court would not know from the expert's testimony whether Niewenhous's prescriptions were illegal.  *Id*. at 51:6–17.  Nonetheless, the State's Attorney insisted that there was evidence of a common nuisance based on "the observations by the officers with respect to the events outside in the parking lot in the common areas," which "all led to the officers' opinion . . . that this was, in fact, a common nuisance." *Id*. at 51:19–23.

The court stated that it "would likely find that . . . she was keeping a common nuisance" if "there was sufficient proof, probable cause, to establish that the Defendant was unlawfully prescribing." *Id*. at 54:12–20.  The court concluded that the State had not established probable cause based on "unlawful prescriptions because there [had not] been any testimony establishing how what she did was unlawful." *Id.* at 54:21–55:2.  Accordingly, it dismissed the charges. *Id*. at 55:4.

### D.  Administrative Proceeding

On October 24, 2018, in an administrative proceeding before the State Board of Nursing following the officers' investigation, Niewenhous participated in a case resolution conference and entered into a "Consent Order of Reprimand." *See* Consent Order of Reprimand 1, ECF 27-7.  In the Consent Order, Niewenhous admitted to the truth of the Board's findings of fact, based on

which it concluded that she had violated provisions of Maryland's Health Occupations Law. *Id.* at 12. Specifically, it found that her conduct at the clinic was "inconsistent with generally accepted professional standards in the practice of registered nursing or licensed practical nursing" and she failed to "practice in accordance with the standards of practice of the American Association of Nurse Practitioners or any other national certifying body recognized by the Board." *Id.* at 9.

### E. Lawsuits

Plaintiffs filed separate lawsuits against the Queen Anne's County Sheriff's Deputies and Maryland State Troopers involved in their investigation and arrests, arguing that they were "falsely and illegally arrested" pursuant to warrants that were "falsely and illegally obtained." Niewenhous Compl. ¶ 14; Delavega Compl. ¶ 15. The suits are consolidated for pretrial purposes. ECF 24. Both suits named Nathaniel Burns, Ryan Davidson, Savanna Dickey, Steven Gore, Patrick Matteson and John Doe #1 as defendants; Delavega also named David W. Waddell. Defendant Gore is a Queen Anne's County Sheriff's Deputy. He led the investigation of plaintiffs and obtained the warrants for their arrests. Defendants Davidson, Dickey, and Matteson are Queen Anne's County Sheriff's Deputies who participated in the investigation of plaintiffs. Defendant Burns, also a Queen Anne's County Sheriff's Deputy, arrested Niewenhous and participated in the investigation of Delavega. Defendant Waddell is the Maryland State Police Trooper who arrested Delavega. John Doe #1 is either a Queen Anne's County Sheriff's Deputy or a member of the Maryland State Police who also participated in the investigation of plaintiffs.

Plaintiffs each bring three § 1983 claims for violation of their Fourth Amendment rights, alleging false arrest (Count I), false imprisonment (Count II), and malicious prosecution (Count III). Counts IV, V, and VI allege the same conduct as violations of the Maryland Declaration of Rights, articles 24 and 26. The remaining counts are Maryland common law claims for false arrest

(Count VII), false imprisonment (Count VIII), malicious prosecution (Count IX), intentional infliction of emotional distress (Count X), gross negligence (Count XI), and tortious interference with prospective advantage (Count XII for Delavega and Count XIII for Niewenhous). Niewenhous also brings a tort claim for injurious falsehood (Count XII for Niewenhous).

Plaintiffs claim that the application for statement of charges included false and misleading statements, such that the warrants were "falsely and illegally obtained" and plaintiffs were "falsely and illegally arrested." Niewenhous Compl. ¶ 14; Delavega Compl. ¶ 15. First, they identify Defendant Gore's statement: "From my training, knowledge and prior experience, I immediately recognized Mid Atlantic Wellness as a 'cash for prescription operation' of the type that attracts drug addicts and dealers from out of the area." Niewenhous Compl. ¶ 17; Delavega Compl. ¶ 18. They allege the statement is false because "[a]t no point was MAW a 'cash for prescription operation[.]'" Niewenhous Compl. ¶ 18; Delavega Compl. ¶ 19. Second, they allege that the statement that "[s]taff at the clinic, not including Ms. Niewenhous [or Mr. Delavega], changed the blood pressure readings of an undercover officer investigating the clinic in order to secure for this undercover officer a higher count of pain pills" is "false and/or misleading because changing a patient's blood pressure reading in this way would not change the number of pain pills prescribed." Niewenhous Compl. ¶ 19(a); Delavega Compl. ¶ 20(a). Third, they claim Gore stated that "Niewenhous did not physically examine an undercover officer investigating the clinic but that she only asked questions about their employment, home life, and other general topics." Niewenhous Compl. ¶ 19(b); Delavega Compl. ¶ 20(b). Plaintiffs allege the statement was "false and/or misleading"

> because Ms. Niewenhous provided a comprehensive assessment to her pain patients, which included, inter alia, gathering relevant social history; medical history; family history; allergy and medication history; the patient's chief complaint; patient's past medical complaints; as well as a physical examination

which included observation of each patient's movements and gait as they were called into the exam room; observation of facial expressions for signs of grimacing or other indicia of pain; observing whether the patient was alert and oriented; observing how the patient answered questions; observing for any signs of acute distress; conducting a heel-toe check; examining the heart and lungs; and ordering appropriate laboratory diagnostic tests.

Niewenhous Compl. ¶ 19(b); Delavega Compl. ¶ 20(b).

Plaintiffs allege that these statements

were not only false, but designed to take facts—such as Ms. Niewenhous conducting a social and family history as part of her exam, or suggesting blood pressure readings are medically relevant to prescription amounts when they are not—out of context and make them seem as though they were nefarious rather than . . . ordinary.

Niewenhous Compl. ¶ 20; *see* Delavega Compl. ¶ 21.   Plaintiffs claim that Detective Gore manipulated the facts "to hide his lack of actual probable cause that a crime had been committed by Ms. Niewenhous [or Mr. Delavega] and to make it seem as though probable cause existed when there was none."  Niewenhous Compl. ¶ 20; *see* Delavega Compl. ¶ 21.

### F.  Pending Motions

All defendants jointly filed a motion to dismiss, or in the alternative, motion for summary judgment, ECF 27 ("Defs.' Mot.").  The parties fully briefed the motion.  ECF 27-1, 31 & 33.  All defendants but Gore and Doe filed a supplemental motion to dismiss, or in the alternative, motion for summary judgment, ECF 28 ("Defs.' Supp. Mot.") to raise additional grounds for dismissal of plaintiffs' claims or summary judgment in defendants' favor.  The parties fully briefed this motion as well.  ECF 28-1, 32, 34.

## II.  Standard of Review

Defendants filed motions "to dismiss, or in the alternative, . . . for summary judgment . . . pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(d)."  ECF 27 & 28.  A Rule 12(b)(6) motion challenges "the legal sufficiency of a complaint" on the grounds that, "even if the facts

alleged by a plaintiff are true, the complaint fails as a matter of law 'to state a claim upon which relief can be granted.'" *Thomas-Lawson v. Koons Ford of Balt., Inc.*, No. SAG-19-3031, 2020 WL 1675990, at *2 (D. Md. Apr. 6, 2020) (citing *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017)); *see* Fed. R. Civ. P. 12(b)(6).

When the parties present evidence with their briefs on a Rule 12(b)(6) motion and the Court considers it, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

> Notably, "the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion." *Ridgell v. Astrue*, DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012). Thus, this requirement "can be satisfied when a party is 'aware that material outside the pleadings is before the court.' " *Walker v. Univ. of Md. Med. Sys. Corp.*, No. CCB-12-3151, 2013 WL 2370442, at *3 (D. Md. May 30, 2013) (quoting *Gay*, 761 F.2d at 177). Indeed, while the Court "clearly has an obligation to notify parties regarding any court-instituted changes in the pending proceedings, [it] does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). [Where] the title of the motion itself [is] "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," [the title] makes it obvious that the Court might construe it as seeking summary judgment, and thereby provides sufficient notice to Plaintiff. *See Ridgell*, 2012 WL 707008, at *7; *see Laughlin*, 149 F.2d at 260-61.

*Tafazzoli v. Nuclear Regulatory Comm'n*, No. PWG-19-1638, 2020 WL 7027456, at *6 (D. Md. Nov. 30, 2020).

Along with their motions, defendants filed, *inter alia*, the application for statement of charges, ECF 27-2; Detective Gore's report to the Assistant State's Attorney assigned to the Task Force, accompanied by an affidavit from Gore, ECF 27-3; and an excerpt from the preliminary hearing transcript, ECF 27-6. Plaintiffs argued in their oppositions to defendants' motions to dismiss or, in the alternative, for summary judgment, that the Court should decline to treat defendants' motions as summary judgment motions under Rule 12(d) because plaintiffs have not

had the opportunity to conduct discovery.  Pls.' Opp'n to Defs.' Mot. 7; Pls.' Opp'n to Defs.' Supp.

Mot. 7.

Under Rule 56(d), if nonmovants such as plaintiffs "show[] by affidavit or declaration that,

for specified reasons, [they] cannot present facts essential to justify [their] opposition, the court

may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations

or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d); *see McClure*

*v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019) (quoting Fed. R. Civ. P. 56(d)).  The Fourth Circuit

"'place[s] great weight on the Rule 56([d]) affidavit' and . . . '[a] reference to Rule 56([d]) and

the need for additional discovery in a memorandum of law in opposition to a motion for summary

judgment is not an adequate substitute for a Rule 56( [d] ) affidavit.'"  *Harrods Ltd. v. Sixty Internet*

*Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv.*

*Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  Thus, if a party does not file a Rule 56(d) affidavit, that

"failure . . .  is itself sufficient grounds to reject a claim that the opportunity for discovery was

inadequate."  *Id.* (quoting *Evans*, 80 F.3d at 961).  Plaintiffs did not file Rule 56(d) affidavits in

response to defendants' motions.

The Court may overlook the failure to file a Rule 56(d) affidavit if "the nonmoving party,

through no fault of its own, has had little or no opportunity to conduct discovery, and . . .  fact-

intensive issues . . .  are involved," and "the nonmoving party has adequately informed the district

court that the motion is pre-mature and that more discovery is necessary."  *Id.*  This case is pre-

discovery, and therefore plaintiffs are not at fault for not conducting discovery into the facts and

circumstances forming the basis for the application for statement of charges.  Nevertheless,

plaintiffs do not need any discovery to support their allegations that Gore's statements in the

application were false or misleading.  Affidavits from plaintiffs themselves could establish a

genuine dispute of these material facts.  Therefore, the Court will not overlook plaintiffs' failure to file Rule 56(d) affidavits and will treat defendants' motions as motions for summary judgment.[5]

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A).  Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment.  *Anderson*, 477 U.S. at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "a party fails to establish the existence of an element essential to that party's case" or "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" then summary judgment is proper.  *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences

---

[5] Even if the Court treated the motions as motions to dismiss, the application for statement of charges nevertheless could be considered because it is integral to Niewenhous's complaint and plaintiffs do not dispute its authenticity.  *See Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013); *see also CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); *Poling v. Foxwell*, No. PWG-18-80, 2021 WL 82885, at *4 (D. Md. Jan. 11, 2021).

drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

### III. Discussion

#### A. Section 1983 Claims Based on Fourth Amendment Violations

The United States Code provides a federal cause of action for any individual who believes a state actor has deprived her of her constitutional rights. *See* 42 U.S.C. § 1983; *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 707 (1999). Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To prevail on a § 1983 claim, a plaintiff must show that: "1) [the defendant violated] a right secured by the Constitution or laws of the United States . . . and 2) [the defendant was] acting under the color of state law." *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2016 WL 1239921, at *4 (D. Md. Mar. 24, 2016) (quoting *Brown v. Bailey*, 2012 WL 2188338, at *5 (D. Md. June 13, 2012)), *aff'd sub nom. Peters v. Caplan*, 672 F. App'x 327 (4th Cir. 2017); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

Plaintiffs allege they were arrested without probable cause, in violation of the Fourth Amendment. "The Fourth Amendment guards the 'right of the people to be secure in their persons . . . against unreasonable searches and seizures' and provides that 'no Warrants shall issue, but upon probable cause.'" *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020), *as amended* (July 15, 2020), *as amended* (July 16, 2020) (quoting U.S. Const. amend. IV). "Unquestionably,

'[t]he Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable.'" *Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 627 (4th Cir. 2007) (quoting *Brooks v. City of Winston–Salem*, 85 F.3d 178, 183 (4th Cir. 1996)).

"[P]robable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *United States v. Brown*, No. GJH-18-0335, 2020 WL 6393392, at *5 (D. Md. Nov. 2, 2020) (quoting *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)) (internal quotation marks omitted)).  It "requires more than 'bare suspicion,' [but] less than that evidence necessary to convict."  *Id.* (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)).  "Probable cause to arrest deals with probabilities and depends on the totality of the circumstances," and "the officer's reasonable ground for belief of guilt 'must be particularized with respect to the person to be searched or seized.'" *Davis v. Prince George's Cty., Md.*, 348 F. App'x 842, 848–49 (4th Cir. 2009) (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)).  Factors that support a finding of probable cause include the officer "consult[ing] with and [seeking] approval from . . . prosecutors before filing charges" and "an independent judicial officer . . . approv[ing] the application and issu[ing] the arrest warrant."  *Schloss v. Lewis*, No. JFM-15-1938, 2016 WL 1451246, at *11 (D. Md. Apr. 12, 2016), *aff'd sub nom. Schloss v. Abey*, 691 F. App'x 710 (4th Cir. 2017).

Plaintiffs were arrested pursuant to warrants.  An individual arrested pursuant to a warrant may prove a § 1983 claim for seizure in violation of the Fourth Amendment if they establish that the warrant was not supported by probable cause.  *See Miller*, 475 F.3d at 627; U.S. Const. amend.

17

IV.  In addition to demonstrating that the defendant "seized plaintiff pursuant to legal process that was not supported by probable cause," the plaintiff must show that "the criminal proceedings . . . terminated in plaintiff's favor." *Ledergerber v. Blubaugh*, No. JKB-20-1208, 2020 WL 7029868, at *5 (D. Md. Nov. 30, 2020) (quoting *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)); *Miller*, 475 F.3d at 627 (noting an arrest "pursuant to legal process that was not supported by probable cause," followed by "criminal proceedings [that] terminated in [the defendant's] favor [is] sufficient to state a . . . claim alleging a seizure that was violative of the Fourth Amendment" (quoting *Brooks*, 85 F.3d at 183–84)).

A plaintiff arrested pursuant to a warrant may establish arrest without probable cause by showing that the material statements in the warrant application contained intentional or reckless misrepresentations or omissions.  *See Miller*, 475 F.3d at 627.  Indeed, "the Supreme Court has long held that a police officer violates the Fourth Amendment if, in order to obtain a warrant, he deliberately or 'with reckless disregard for the truth' makes material false statements or omits material facts."  *Miller*, 475 F.3d at 631 (quoting *Franks v. Delaware*, 438 U.S. 154, 155 (1978)); *Hicks v. Anne Arundel Cty.*, No. JKB-20-22, 2020 WL 7624773, at *11 (D. Md. Dec. 22, 2020) ("In *Franks v. Delaware*, the Supreme Court held the Fourth Amendment may be violated when 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause.'" (quoting *Franks*, 438 U.S. at 155–56)).

To prevail on a § 1983 claim for arrest without probable cause in violation of the Fourth Amendment, based on misrepresentations or omissions in a warrant application,

> a party must show (1) intentionality, which means that "the affiant either intentionally or recklessly made a materially false statement or that the affiant intentionally or recklessly omitted material information from the affidavit," and (2)

> materiality, which means that if a defendant's affidavit were corrected, it would no
> longer establish probable cause.

*Hicks*, 2020 WL 7624773, at \*11 (citing *United States v. Wharton*, 840 F.3d 163, 169–70 (4th Cir.

2016)); *see Nero v. Mosby*, 890 F.3d 106, 128 (4th Cir. 2018) ("[To] challenge a probable-cause

affidavit, such as the application for Statement of Charges, [a plaintiff must] show[] that the affiant

'knowingly and intentionally, or with reckless disregard for the truth,' included 'a false

statement.'" (quoting *Franks*, 438 U.S. at 155–56)).  This is called "the *Franks* test."  *Hicks*, 2020

WL 7624773, at \*11.  It "arose and is frequently applied in the criminal context," but "the Fourth

Circuit has applied this test to ascertain the constitutionality of false or omitted statements

underlying arrest warrants in civil § 1983 actions brought by formerly detained individuals."  *Id.*

(citing *Evans v. Chalmers*, 703 F.3d 636, 649–50 (4th Cir. 2012); *Miller*, 475 F.3d at 627).

The first prong under *Franks* is an intentional or misleading false statement.  The plaintiff

may show that the affidavit contains an intentionally false or misleading statement in one of two

ways.  *Miller*, 475 F.3d at 627.  First, the plaintiff may establish that the police officer "deliberately

or with a 'reckless disregard for the truth' made material false statements in his affidavit."  *Id.*

(quoting *Franks,* 438 U.S. at 171).  "The Fourth Circuit has held that a plaintiff in a § 1983 action

can sufficiently plead intentionality when '[n]o record evidence lends any support for [a police

officer's] statements' underlying his affidavits, and clarified that such statements can be

considered 'deliberate falsehoods.'"  *Hicks*, 2020 WL 7624773, at \*12 (quoting *Evans*, 703 F.3d

at 650).  The officer acted with "reckless disregard" in making a false statement if they "acted

'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the

evidence, the affiant must have entertained serious doubts as to the truth of his statements or had

obvious reasons to doubt the accuracy of the information he reported.'"  *Miller*, 475 F.3d at 627

(quoting *Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir. 2000) (internal quotation marks omitted)).

Second, the plaintiff may establish that the police officer "omitted from that affidavit 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Id.* (quoting *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990) (internal quotation marks omitted)).   The officer acted with "reckless disregard" in omitting facts if they "failed to inform the judicial officer of facts [they] knew would negate probable cause." *Id.* (quoting *Beauchamp v. City of Noblesville, Inc.,* 320 F.3d 733, 743 (7th Cir. 2003)); *see Nero v. Mosby,* 890 F.3d 106, 130 (4th Cir. 2018) (quoting *Miller*); *Hicks v. Anne Arundel Cty.*, No. JKB-20-0022, 2020 WL 7624773, at *9 (D. Md. Dec. 22, 2020).   Negligence and "innocent mistake" do not suffice.  *Miller*, 475 F.3d at 627–28 (quoting *Franks*, 438 U.S. at 171); *see Nero*, 890 F.3d at 130.

The second prong under *Franks* is materiality.   *Hicks*, 2020 WL 7624773, at *11. "Material" statements are those "necessary to the [neutral and disinterested magistrate's] finding of probable cause."  *Miller*, 475 F.3d at 628 (quoting *Franks,* 438 U.S. at 155); *see Osborne v. Georgiades*, 679 F. App'x 234, 239 (4th Cir. 2017); *Love v. Rumgay*, No. RDB-13-1402, 2016 WL 1028001, at *8 (D. Md. Mar. 15, 2016).   Conversely, "omitted facts are material [if] their inclusion would have defeated probable cause."  *Osborne*, 679 F. App'x at 239.   Thus, "[t]o determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause.'  If the 'corrected' warrant affidavit establishes probable cause, no civil liability lies against the officer."  *Miller*, 475 F.3d at 628 (quoting *Wilson,* 212 F.3d at 789); *see also Osborne*, 679 F. App'x at 239.   Put differently, the Court "disregard[s] [the officer's] alleged misleading statements, and tak[es] into account the facts [the plaintiff] believes would have been exculpatory" and then "review[] the 'corrected' facts" to determine whether "probable cause

existed to support issuance of the arrest warrant." *Davis v. Prince George's Cty., Md.*, 348 F. App'x 842, 848–49 (4th Cir. 2009) (citing *Miller,* 475 F.3d at 628).

The plaintiff bears the burden of proof. *Davis*, 348 F. App'x at 844; *Miller*, 475 F.3d at 627. At the summary judgment stage, an "unsupported allegation that [the police officer] included 'deliberate false statements'" in the application for statement of charges "amounts to precisely the type of unmoored legal conclusion that [the Court is] required to ignore." *Schloss*, 2016 WL 1451246, at *10. Without more, the plaintiff fails to "create[] [a] genuine issue of fact showing that [the officer's] application for a statement of charges was not justified by probable cause, and that the application contained falsehoods." *Id.* at *11. An application for a statement of charges need not "include every piece of exculpatory information." *Nero*, 890 F.3d at 130 (citing *Evans v. Chalmers*, 703 F.3d 636, 651 (4th Cir. 2012)). "Drafting a probable-cause statement involves advocacy— . . . So long as the application includes all *material* facts, a prosecutor need not also present the defendant's defense." *Id.*

### B.  Analysis

Defendants believe they are entitled to summary judgment on plaintiffs' § 1983 claims because no reasonable jury could find in plaintiffs' favor. Defs.' Mem. 30–31. Specifically, they argue there is no genuine dispute that there was probable cause for plaintiffs' arrest.[6] *Id.* at 5. First, they contend plaintiffs cannot challenge the existence of probable cause because Niewenhous later admitted that she violated the law and now both plaintiffs are estopped from arguing otherwise. *Id.* at 15–20. Second, defendants contend the preliminary hearing judge's ruling shows

---

[6] Defendants do not dispute that they were acting under color of state law when Detective Gore submitted the warrant application and they arrested, or caused the arrest of, plaintiffs. Also, it is undisputed that the criminal proceedings terminated in plaintiffs' favor because the preliminary hearing judge dismissed the charges. *See* Defs.' Mem. 4, 10–11; Pls.' Opp'n 1–2.

that the warrants were supported by probable cause because the only element the judge found lacking was not actually required under Maryland law. *Id.* at 21–22. Third, they argue that the statements in Detective Gore's application established probable cause and, on the record before the Court, none of the statements was false or misleading. *Id.* at 13, 24, 28–31.

### 1. Judicial Estoppel

Defendants' first argument is that judicial estoppel bars Niewenhous from asserting that "the State lacked evidence that her prescriptions were illegal" because she admitted in an administrative proceeding before the State Board of Nursing that "her prescriptions to MAW patients violated standards imposed by Maryland law." Defs.' Mem. 16.[7] They contend "Ms. Niewenhous's admission also warrants summary judgment on all Mr. Delavega's claims" because he cannot "refute or contradict the Board's findings and conclusions so as to generate a genuine dispute of material fact on this issue" and he is "preclude[d] . . . from relitigating it under principles of collateral estoppel and issue preclusion." *Id.* at 19–20. This argument is unpersuasive.

> [J]udicial estoppel is an equitable doctrine, designed to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted). Typically, judicial estoppel is reserved for cases where the party to be estopped . . . has taken a later position that is "clearly inconsistent" with her earlier one; has persuaded a court to adopt the earlier position, creating a perception that "either the first or the second court was misled"; and would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51, 121 S.Ct. 1808 (internal quotation marks omitted). Finally, and central to this case, there is the longstanding principle that judicial estoppel applies only when "the party who is alleged to be estopped *intentionally* misled the court to gain unfair advantage," and not when "a party's prior position was based on inadvertence or mistake." *John S. Clark Co. v. Faggert & Frieden, P.C.*, 65 F.3d 26, 29 (4th Cir. 1995) (emphasis added) (internal quotation marks omitted); *accord*

---

[7] Although defendants use the term "collateral estoppel" in their heading, their argument focuses on judicial estoppel. *See, e.g.*, Defs.' Mem. 17 ("Ms. Niewenhous is barred from contending her arrest lacked probable cause under the doctrine of judicial estoppel."). Accordingly, the Court will consider the doctrine of judicial estoppel. *See* Fed. R. Civ. P. 1.

*New Hampshire*, 532 U.S. at 753, 121 S.Ct. 1808 (quoting *John S. Clark*, 65 F.3d at 29).

*Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019).  The three criteria for judicial estoppel are:

> First, the party sought to be estopped must be advancing a factual position inconsistent with a factual position taken in earlier litigation. Second, the prior factual statement "must have been accepted by the court." Third, the party sought to be estopped "must have intentionally misled the court to gain unfair advantage."

*Dorsey v. Ruth*, 222 F. Supp. 2d 753, 755 (D. Md. 2002) (quoting *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996)).

The doctrine of judicial estoppel does not apply to the facts of this case.  The issue presented in this lawsuit is whether probable cause supported Detective Gore's application for the arrest warrants.  This inquiry requires consideration of what Detective Gore knew at the time he submitted the application.  *United States v. Brown*, No. GJH-18-0335, 2020 WL 6393392, at *5 (D. Md. Nov. 2, 2020) (stating that, for an arrest to be supported by probable cause, there must be "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense") (quoting *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)) (internal quotation marks omitted)).  The determination of probable cause to arrest does not consider either what the officer later learned or what further investigation established.  *See id.*

*Lowery*, 92 F.3d 219, and *Dorsey*, 222 F. Supp. 2d 753, which defendants cite, are not on point.  In *Lowery*, the plaintiff based his § 1983 claim on his allegation that one of the defendant officers attacked him "for no reason."  92 F.3d at 221–22.  The trial court concluded that the plaintiff was judicially estopped from alleging that the officer was unprovoked or disputing that he first attacked the other police officer, because he had pled guilty to attacking the officer.  *Id.*

Because the attack was undisputed, the court held that the officer's shooting of the plaintiff when he was attacking the other officer was objectively reasonable and the officer therefore was entitled to qualified immunity.  *Id.* at 222–23.  The Fourth Circuit affirmed.  *Id.*

In *Dorsey*, a case with a "strikingly similar" fact pattern to *Lowery*, the plaintiff filed suit under § 1983 against a police officer, alleging that the officer "shot him without justification."  222 F. Supp. 2d at 753–54.  The trial court concluded there was "no 'genuine issue of material fact,' as to whether Officer Ruth had justification for his use of force against Dorsey" and granted the defendant's summary judgment motion.  *Id.* at 756 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court reasoned that Dorsey was judicially estopped from claiming that the officer was not justified in using force or disputing that he threatened another officer, because, in the guilty plea Dorsey entered in his criminal case, he admitted that "he put [the other officer] in danger by backing his vehicle at her."  *Id.*

Thus, the facts in *Lowery* and *Dorsey* are inapposite because Lowery and Dorsey alleged in their § 1983 claims that they did not engage in the very conduct to which they previously pleaded guilty in their criminal cases.  The courts denied their attempts to take clearly inconsistent positions.

Plaintiffs are not taking clearly inconsistent positions.  In these lawsuits, they allege that the warrant application was not supported by probable cause.  Niewenhous Compl. ¶ 25 ("Ms. Niewenhous was falsely and illegally charged without probable cause, with . . . [a] felony charge of maintaining a common nuisance for the illegal distribution of a narcotic (Oxycodone) . . . ."); Delavega Compl. ¶ 26 ("Mr. Delavega was falsely and illegally charged without probable cause, with a felony charge of maintaining a common nuisance for the illegal distribution of a narcotic, by Defendant Gore, with the material participation and assistance of the other Defendants.").  In

24

the administrative proceeding before the Board of Nursing, Niewenhous admitted to a prescriptive practice that was "inconsistent with the standards of practice for a CRNP."  Consent Order of Reprimand 9, ECF 27-7.  Based on this conduct, the Board found that she violated Md. Code Ann., Health Occ. § 8-316(a).  Niewenhous did not admit that she illegally prescribed or distributed opioids.  Even if Niewenhous's admissions before the Board of Nursing could be construed as admissions of criminal conduct, Niewenhous did not admit that there was probable cause to arrest her, which is the contested issue here.  Thus, the first criterion for judicial estoppel, that "the party sought to be estopped must be advancing a factual position inconsistent with a factual position taken in earlier litigation," is not met.  *See Dorsey*, 222 F. Supp. 2d at 755; *Lowery*, 92 F.3d at 224.[8]  Accordingly, judicial estoppel is not a bar to plaintiffs' allegations in this case.  *See Dorsey*, 222 F. Supp. 2d at 755; *Lowery*, 92 F.3d at 224.

### 2.  Probable Cause

Plaintiffs claim Detective Gore made false statements in his application for arrest warrants and that, without the false statements, there was no probable cause for their arrests.  Defendants dispute whether the application contained materially false statements and insist there was probable cause to arrest plaintiffs, even without consideration of the alleged false statements.  Before I determine whether Detective Gore intentionally or recklessly included any false statements in his application for the arrest warrants and whether the application, excised of the allegedly false statements, established probable cause, I first consider the elements of keeping a common nuisance, the crime with which the plaintiffs were charged.

---

[8] Although the Court need not reach the issue, it does not appear that defendants have established the second or third criteria for judicial estoppel.  Niewenhous's prior factual admissions were made to the Board of Nursing; they were not accepted by a court.  And there is no evidence that Niewenhous intentionally misled the Board of Nursing or this Court.

### a.  Elements of Keeping a Common Nuisance

The application for statement of charges against Delavega and Niewenhous alleged that they violated Maryland's Criminal Law § 5-605(a)(2).  App. for Stmt. of Charges 2, ECF 27-2.[9] Pursuant to Md. Code Ann., Crim. Law § 5-605, it is a felony to "keep a common nuisance."  Crim. Law § 5-605(b).  Subsection (a)(2) of the statute defines "common nuisance" as "a dwelling, building, vehicle, vessel, aircraft, or other place . . .  where controlled dangerous substances or controlled paraphernalia are manufactured, distributed, dispensed, stored, or concealed illegally." Crim. Law § 5-605(a)(2).  A substance is "dispensed" if it is "deliver[ed] to the ultimate user or the human research subject by or in accordance with the lawful order of an authorized provider." Crim. Law § 5-101(*l*)(1).  "'Dispense' includes to prescribe, administer, package, label, or compound a substance for delivery."  Crim. Law § 5-101(*l*)(2).  A controlled substance is "distributed" if it is "deliver[ed] other than by dispensing."  Crim. Law § 5-101(m).  Thus, to prescribe illegally is to distribute.  *See id.*

> Plaintiff Niewenhous was a licensed healthcare provider authorized to prescribe opioids.
>
> Licensed healthcare providers may only prescribe opioids if to do so is within their regular professional duties. Licensed healthcare providers are also required to base prescribing decisions on evidence-based clinical guidelines. . . .  Once a licensed healthcare provider determines that a prescription is appropriate, the provider must prescribe only the lowest effective dose for pain management.  Moreover, the reason for the prescription and the actual act of prescribing opioids must be in

---

[9] The application for statement of charges also stated that Delavega, Niewenhous, and Saldana knowingly or intentionally maintained a building "resorted to by drug abusers for the purpose of using controlled dangerous substances" or "used for the keeping and selling of controlled dangerous substance contrary to the law and in violation of CR 5-902a4i, ii and numerous other common nuisance laws."  App. for Stmt. of Charges 2.  A violation of Criminal Law § 5-902(a)(4) is, at most, a misdemeanor.  Crim. Law § 5-902(e)(1), (2).  Probable cause for a misdemeanor outside officer's presence does not support lawful arrest.  *Lewis v. State*, 233 A.3d 86, 101 (Md. 2020) ("Probable cause to conduct a lawful arrest requires that the arrestee committed a felony or was committing a felony or misdemeanor in a law enforcement officer's presence.").  Therefore, only facts showing a violation of Criminal Law § 5-605(a)(2) would provide probable cause to arrest defendants pursuant to this warrant.  *See id.*

conformity with the standards of the medical profession.  Violating these standards can result in a licensed healthcare provider being prosecuted for drug crimes.

*Harris v. State*, No. 745, Sept. Term 2018, 2019 WL 4928640, at *2 (Md. Ct. Spec. App. Oct. 7, 2019) (citing Crim. Law § 5-902(c)(1), (2); Md. Code Ann., Health Occ. § 1-223(b), (c)).

To "keep" a common nuisance, the defendant does not need to own or possess the property where the distribution, manufacturing, or storage occurs.  *Fitchett v. State*, No. 0003, Sept. Term 2017, 2019 WL 1254177 (Md. Ct. Spec. App. Mar. 18, 2019) (unreported); *see* MPJI-Cr § 4:24.8 (noting "there must be a connection between the accused and the place in question," but the State does not "need to show that the defendant has legal ownership or possession of the premises").  In considering whether an individual kept a common nuisance, the Court's analysis

> should focus on the circumstances of the common nuisance itself and not solely, or even necessarily, on the defendant's legal authority over the place where the common nuisance is located. *See e.g. Mora v. State,* 123 Md. App. 699, 729 (1998) (evidence sufficient to sustain defendant's conviction of keeping a common nuisance, despite wife's uncontroverted testimony that she, not the defendant, controlled the premises); *McMillan v. State*, 325 Md. 272, 294 (1992) (evidence sufficient to show that defendant had maintained a common nuisance at a nightclub he merely managed); *Tucker v. State*, 19 Md. App. 39, 46 (1973) (activities on premises, not proprietary interest or physical occupancy, determinative of whether evidence sufficient to sustain conviction of maintaining a common nuisance); *Ware v. State*, 13 Md. App. 302, 308 (1971) (evidence sufficient to sustain conviction of keeping a common nuisance, despite fact that the defendant neither lived at nor owned the premises); *See also Curley v. State*, 215 Md. 382, 389-90 (1958) ("A house may be disorderly either from the purpose for which it is appropriated, or from the mode in which it is kept. The charge does not respect ownership or proprietorship, but the conduct of the place.").

*Fitchett*, 2019 WL 1254177, at *5.

For the defendant to "keep" a common nuisance, the distribution, manufacturing, or storage of the controlled substance must be of a "continuing and recurring character."  *McMillian v. State*, 600 A.2d 430, 441 (Md. 1992); *see* MPJI-Cr § 4:24.8.  "[T]here is no particular extent of time prescribed during which the improper practices must continue or recur, and each case must be adjudged according to its own circumstances."  *McMillian*, 600 A.2d at 441 (citing *Hunt v. State*,

314 A.2d 743, 744–45 (1974)).   The Court considers "the circumstances of the case and the inferences properly drawn therefrom" to determine whether, "'when the character of the culpable acts and the circumstances under which they were committed are taken into account, it appears that they were repeated often enough to warrant an inference that the house was kept for the indulgence of such practices.'"  *Id.* (quoting *Hunt*, 314 A.2d at 744–45).   Thus, "evidence . . . found only on a single occasion" can "be sufficient to show a crime of a continuing nature."  *Id.* (quoting *Hunt*, 314 A.2d at 744).   Indeed, in *McMillian*, the Maryland Court of Appeals concluded that this element was present based on surveillance and physical evidence obtained on a single afternoon.  *Id.* at 441–42.

The defendant must keep the premises "for the purpose of selling and storing narcotics," and "scienter is required to support a conviction for keeping a [common nuisance]."  *Pettiford v. State*, 261 A.2d 216, 220 (Md. Ct. Spec. App. 1970); *see Ware v. State*, 283 A.2d 177, 181 (Md. Ct. Spec. App. 1971) (citing *Pettiford*).   It is not necessary, however, that the defendant herself distributed controlled substances.  *See McMillian*, 600 A.2d at 442; *Pettiford*, 261 A.2d at 220; *Fitchett*, 2019 WL 1254177, at *6.   With regard to the scienter required to support a conviction under Crim. Law § 5-605(a)(2), as well as the conduct necessary for a finding of guilt, *Pettiford* is informative.   There, Herman Pettiford's codefendant John Berry occupied the premises at issue and admitted that the narcotics found in the premises were his.  261 A.2d at 220.   Pettiford had rented the premises "as a favor for John Berry" while Berry was incarcerated and "paid the gas, electric, and telephone bills until Berry came home."  *Id.*   The appellate court concluded that Pettiford's "conviction for keeping a house for the purpose of selling and storing narcotics" was not clearly erroneous because scienter could be inferred from the evidence that "Pettiford paid the rent and utilities on the property for almost a year[,] . . . the property was frequently and constantly

resorted to for the purchase of narcotics," the police found drug paraphernalia on the premises, and "Pettiford was actually present for a 23 minute period while the property was under observation by the officers during which time two persons entered the property and a third one left the property staggering." *Id.* There was no reported evidence that Pettiford himself engaged in illegal narcotics transactions on the premises.

*McMillian*, 600 A.2d 430, also provides guidance. There, the Maryland Court of Appeals considered whether the evidence was sufficient to convict Robert Lee McMillian of maintaining a common nuisance under Article 27, § 286(a)(5), now codified as Crim. Law § 5-605(a)(2). *Id.* at 431. McMillian was the manager of a "private social club" in Baltimore. *Id.* at 432 & 433. The evidence before the jury included "numerous complaints about the sale of controlled dangerous substances from that location," the results of four hours of "covert surveillance" on one day, the arrest of multiple individuals leaving the club who were found to be in possession of controlled substances, and controlled substances and drug paraphernalia seized when officers searched the club. *Id.* at 432, 433–34 & 441. Additionally, when Baltimore Police Officer James Rood investigated, although he "never saw [McMillian] distribute drugs, . . . he did see [him] watch drug transactions occur." *Id.* at 432. Also, McMillian attempted to prevent the police from entering. *Id.* at 433. Further, when Officer Rood asked why McMillian was "involved with drugs like this," McMillian responded, "because I have to make a living somehow." *Id.* at 440.

The court framed the issue as "whether the evidence adduced at trial was legally sufficient to show that the Club managed by McMillian was used for proscribed drug activities on a recurring basis." *Id.* at 441. It considered "the character of the inculpatory acts and the circumstances under which they were being committed" and concluded that, "[f]rom this evidence, the jury could reasonably have inferred that McMillian was maintaining a building that was being used on a

recurring basis to distribute, dispense, store or conceal drugs . . . in violation of Article 27, § 286(a)(5)." *Id.* at 442.

In *Fitchett v. State*, 2019 WL 1254177, a more recent albeit unreported Maryland Court of Special Appeals opinion, the court also considered the sufficiency of the evidence to establish whether the defendant kept a common nuisance where the defendant did not own the premises and there was no evidence that the defendant himself distributed controlled substances. *Id.* at *6. The evidence showed that Fitchett "was more than a mere 'casual visitor'" to the premises at issue (a mobile home) because he visited it almost daily; had his own bedroom, personal effects, and dogs there; had a key to the home; and had installed security cameras on the property. *Id.* Additionally, the police found heroin, a digital scale, and cash in the mobile home, and they found bags like the ones used to wrap the heroin in Fitchett's bedroom. The court concluded that "[f]rom these facts, a reasonable inference can be drawn that [Fitchett] was 'keeping' the mobile home for drug activity." *Id.*

Plaintiffs argue that Crim. Law § 5-605(a)(2) "requires that the person [charged] be involved in the manufacturing, distribution, dispensation, storing, or concealing of the illicit substance." Pls.' Opp'n 14. Plaintiffs rely on *Mora v. State*, 720 A.2d 934 (Md. Ct. Spec. App. 1998), *aff'd but criticized*, 735 A.2d 1122 (Md. 1999), but it neither supports their position nor is on point. There, the defendant was married to the "legal possessor" of the property where sales of controlled substances had occurred, and it was undisputed that the defendant had been involved in the sale of controlled substances on the property. *Id.* at 948. The analysis focused on whether the defendant was keeping the property, even though he was not the landowner. The court concluded that the evidence was "sufficient to conclude, beyond a reasonable doubt, that he was in possession of the property for the purpose of maintaining a common nuisance." *Id.* The court did not address

30

whether the defendant's involvement in the sale of controlled substances on the property was necessary to his conviction.

Plaintiffs have not identified any case law holding that the suspect herself must have distributed, manufactured, or stored a controlled substance to be charged under Crim. Law § 5-605(a)(2).  As discussed above, Maryland law requires proof that the person kept the premises for the purpose of distribution, manufacturing, or storage of a controlled substance and had knowledge of the distribution, manufacturing, or storage on the premises.  *See McMillian*, 600 A.2d at 431–33, 440–42; *Ware*, 283 A.2d at 181; *Pettiford*, 261 A.2d at 220; *Fitchett*, 2019 WL 1254177, at *6.  Therefore, the State was not required to show that Niewenhous was illegally prescribing opioids to establish probable cause that she kept a common nuisance.[10]

### b.  The Statements in the Warrant Application

Plaintiffs claim three of Detective Gore's statements in the application for arrest warrants were false and/or misleading.  The first alleged false statement is that Mid Atlantic Wellness was

---

[10] Certainly, the comment to the Maryland Criminal Pattern Jury Instructions ("MPJI-Cr"), which is not controlling authority, states that a conviction under § 5-605(a)(2) for keeping a "place . . . where controlled dangerous substances or controlled paraphernalia are manufactured, distributed, dispensed, stored, or concealed illegally" requires sufficient evidence that "*the defendant himself unlawfully uses* the property to manufacture, sell, or store illegal narcotics."  MPJI-Cr § 4:24.8: Narcotics and Controlled Dangerous Substance--Keeping a Common Nuisance (emphasis added). This suggests that there must be evidence that the defendant is manufacturing, selling, or storing CDS on the premises, rather than simply maintaining the premises for that purpose.  Yet none of the three cases the MPJI-Cr cites in support of this proposition holds that a conviction requires evidence that the defendant is manufacturing, selling, or storing CDS on the premises.  *See Baldwin v. State*, 468 A.2d 394, 397 (Md. Ct. Spec. App. 1983) (holding that defendant did not need to "[k]eep[] the premises open to the public" to be guilty of keeping a common nuisance where "appellate manufactured drugs [on the premises] in such quantity as to indicate that the drugs would be distributed to others"); *Hunt v. State*, 314 A.2d 743, 745 (Md. Ct. Spec. App. 1973) (holding that "evidence seized on a single day" could "prove continuing acts constituting a common nuisance"); *Nickens v. State*, 301 A.2d 49, 53 (Md. Ct. Spec. App. 1973) (holding that "[t]he proof of narcotic violations occurring only at the time in question was insufficient to establish the element of the recurring nature of the offense of 'common nuisance'").

a "cash for prescription operation." Niewenhous Compl. ¶ 17; Delavega Compl. ¶ 18. The second alleged false statement is that clinic staff other than plaintiffs "changed the blood pressure readings of an undercover officer investigating the clinic in order to secure for this undercover officer a higher count of pain pills." Niewenhous Compl. ¶ 19(a); Delavega Compl. ¶ 20(a). The third alleged false statement is that "Niewenhous did not physically examine an undercover officer investigating the clinic but that she only asked questions about their employment, home life, and other general topics." Niewenhous Compl. ¶ 19(b); Delavega Compl. ¶ 20(b).

Defendants argue that plaintiffs' § 1983 claims cannot survive summary judgment because plaintiffs offer no evidence of falsehood, misrepresentation, or omission in the warrant application. Defs.' Mem. 28–30; Defs.' Reply 2, 4–5. Along with their motion, defendants submitted the application for statement of charges, ECF 27-2, and Detective Gore's report to the Assistant State's Attorney assigned to the Task Force, accompanied by an affidavit from Gore, ECF 27-3. Defendants assert that the State produced more than 500 pages of records from the investigation, as well as surveillance videos. Defs.' Mem. 30. Plaintiffs, who bear the burden of proof, did not rely on or dispute the veracity of those documents. Nor have they submitted affidavits or other evidence in support of their position. Accordingly, the facts that defendants' exhibits establish are undisputed. The Court will consider these facts as to each allegedly false or misleading statement.

### i. Cash for Prescription Operation

Contrary to plaintiffs' unsupported allegations that Mid Atlantic Wellness was not a "cash for prescription operation," Gore's application shows that Mid Atlantic Wellness employees did indeed prescribe opiates and that the business accepted only cash for payment. Detective Gore stated that Mid Atlantic Wellness required "a $350.00 initial cash payment with each subsequent visit costing $275.00." App. for Stmt. of Charges 2. The company did not accept insurance. *Id.*

The application also states that Mid Atlantic Wellness had the hallmarks of a "cash for prescription operation," including requiring cash payments, providing opioid prescriptions for many out-of-state patients, and providing only brief examinations.  *See United States v. Crittenden*, 716 F. App'x 142, 143–44 (4th Cir. 2017) (describing "'pill-mill' operations" in which the clinic in question "was unusually busy; it required up-front cash payments and did not accept insurance; it had many young, out-of-state patients with no visible pain or injury; and its doctors prescribed large quantities of oxycodone and alprazolam to their patients"); *Harris v. State*, No. 745, Sept. Term 2018, 2019 WL 4928640, at *1 (Md. Ct. Spec. App. Oct. 7, 2019) (affirming conviction for conspiracy to keep common nuisance where defendant was "a layperson, not a licensed healthcare provider," who "incorporated and owned . . .  a 'pain management clinic ... specializ[ing] in prescribing pain pills'" and the clinic "had no medical equipment," only cash payments were accepted, and "[m]edical examinations were cursory," yet patients received high dosages of opioids).  The company "advertised through word of mouth and on Facebook," had a phone number with "no legitimate subscriber information," and appointments could be made on Facebook with either Delavega or Niewenhous, although Niewenhous was the only one who could "legally write prescriptions from Mid Atlantic Wellness."  App. for Stmt. of Charges 2. Additionally, the clinic was "only open certain days."  *Id.*  Further, other tenants in the building complained that Mid Atlantic Wellness patients "were sleeping, urinating, fighting and creating disturbances in the parking lot, bathrooms and hallways shared with other tenants."  *Id.*  Mid Atlantic Wellness employees were hostile when management relayed the other tenants' complaints.  *Id.*  Patients had out-of-state license plates and waited in the parking lot "for hours on end."  *Id.*

Moreover, Detective Gore's report negates plaintiffs' unsupported allegations that he intentionally fabricated this statement, because it provides additional evidence that Mid Atlantic Wellness was indeed a cash for prescription operation.  The report Gore provided to the Assistant State's Attorney shows that Mid Atlantic Wellness was not registered or licensed to do business in Maryland.  Report, ECF 27-3, at 7.  Its hours were irregular and extended into the evening.  *Id.* at 8, 13.  In addition, Delavega previously worked as "a 'recruiter' for [a] 'pill mill'" and "had operated several other pain management clinics," one of which the DEA "shut down . . . for illegally selling prescription pain pills."  *Id.* at 10, 12.  Also, "numerous pharmacies" were concerned about whether "Mid Atlantic Wellness was a legitimate business or a pill mill" because patients trying to fill prescriptions "were from out of state and always seemed to be in a hurry, more so than average customers."  *Id.* at 8.

These undisputed facts are consistent with Gore's description of Mid Atlantic Wellness as a "cash for prescription operation."  *See Crittenden*, 716 F. App'x at 143–44; *Harris*, 2019 WL 4928640, at *1.  Because plaintiffs have not identified any evidence to the contrary and rely solely on the bald allegations in their complaints, they have not met their burden of proving that Detective Gore's statement that Mid Atlantic Wellness was a "cash for prescription operation" was false or misleading or that he intentionally made any false or misleading statement about the nature of the operation.  *See Davis*, 348 F. App'x at 844; *Miller*, 475 F.3d at 627.

### ii.  Changing Blood Pressure Readings

Plaintiffs also fail to show it was intentionally misleading for Detective Gore to state that a Mid Atlantic Wellness employee would lower the undercover investigator's blood pressure readings to help him receive a higher count of pain pills.  Niewenhous Compl. ¶ 19(a); Delavega Compl. ¶ 20(a).  They have not shown, or even alleged, that the employee did not actually alter

the undercover officer's blood pressure readings.   Defendants have offered uncontroverted evidence that "Saldana changed the undercover officer's blood pressure readings on multiple occasions."  Gore Rept., ECF 27-3, at 43.  Moreover, plaintiffs have not shown that Detective Gore's inference that a lower blood pressure reading would have enabled the undercover investigator to receive more opioid pills was misleading, let alone intentionally misleading. Indeed, blood pressure should be monitored while a patient is receiving oxycodone because "[i]f high blood pressure occurs or worsens while taking this medicine, it may lead to serious heart problems."   Oxycodone And Ibuprofen (Oral Route), https://www.mayoclinic.org/drugs-supplements/oxycodone-and-ibuprofen-oral-route/precautions/drg-20062031 (last visited Feb. 17, 2021).  Consequently, plaintiffs have not demonstrated that Detective Gore's statement that an employee changed blood pressure readings to enable the undercover investigator to obtain more pain pills was intentionally false or misleading.  *See Davis*, 348 F. App'x at 844; *Miller*, 475 F.3d at 627.

### iii.  Niewenhous's Examinations

Detective Gore's statement regarding Niewenhous's physical examination and questioning of the undercover investigator is not false or misleading, as plaintiffs claim.  To begin, Detective Gore did not state, as plaintiffs allege, that "Niewenhous did not physically examine" the UI.  *See* Niewenhous Compl. ¶ 19(b); Delavega Compl. ¶ 20(b).  Rather, he stated that "*[d]uring multiple visits* to Mid Atlantic Wellness, when the undercover investigator was seen by Laura Niewenhous, she did not physically examine the undercover officer."  App. for Stmt. of Charges 3 (emphasis added).  Over the course of the UI's six monthly appointments, Niewenhous physically examined the UI "very brief[ly]" in August and not at all in September, October, or December.  Gore Rept., ECF 27-3, at 22, 23, 28–30, 39–42.  He also stated that "Niewenhous would frequently only ask

the undercover officer very mundane questions about his employment home life and other very general questions, not relating to or pertinent to his injury or pain level." App. for Stmt. of Charges 3. It is undisputed that Niewenhous did not ask about the UI's injury or pain level during his August, September, or December appointments. Gore Rept., ECF 27-3, at 22, 25, 41–42. And, during his October appointment, although Niewenhous discussed the UI's pain level with him, she focused on his statement that he obtained additional medication without a prescription, in violation of his pain contract. *Id.* at 28–30. Despite learning this, she continued to prescribe pain medication for him and even increased his prescription. *Id.* In light of this evidence, plaintiffs have not established that Detective Gore's statements about Niewenhous's examinations of the UI were either false or misleading.

Plaintiffs' unsupported allegations about the three allegedly false and misleading statements simply cannot "create[] [a] genuine issue of fact showing that [the officer's] application for a statement of charges was not justified by probable cause, and that the application contained falsehoods." *See Schloss*, 2016 WL 1451246, at *11.

### c.   Materiality

Even if plaintiffs had shown that the three statements were intentionally false or misleading, they could not prevail on their § 1983 claims on this basis because the statements were not material to the probable cause finding. *See Hicks*, 2020 WL 7624773, at *11. That is, the state court judge who reviewed the warrant application could have found probable cause to arrest plaintiffs without them. *See Miller*, 475 F.3d at 628.

When the allegedly false statements are excised from the application for statement of charges, the remaining facts establish probable cause to believe Niewenhous and Delavega kept a common nuisance. The excised application details how the clinic operated, based on six months of surveillance and investigation, including visits to Mid Atlantic Wellness by an undercover

investigator.  App. for Stmt. of Charges 2.  The business accepted only cash payments; was open limited hours; served out-of-state patients; relied on word of mouth referrals and Facebook appointments with Niewenhous or Delavega, who was not licensed to prescribe; and did not have a legitimate phone number.  *Id.*  Its patients' activities (loitering, urinating, and fighting) generated complaints from other tenants.  *Id.*  The receptionist "frequently wr[o]te an increased pain level on the undercover officers [sic] medical chart, . . .  in an attempt for the undercover officer to obtain a higher count of Schedule II prescription medications" and "continuously ask[ed] the undercover officer if he knew anyone that was eligible for pain management and offer a discount on the undercover officer's next visit if he was able to provide Mid Atlantic Wellness with additional customers."  *Id.* at 3.  The patients "intended to abuse or sell" the controlled substances they obtained through the clinic, sold narcotics to the UI, including one sale "right in the waiting room of the clinic."  *Id.*  Additionally, the six months of surveillance, including six undercover visits and interactions on the premises leading to illegal distribution of controlled substances, sufficiently show that the distribution was continuous or recurring, even if there was only evidence of a sale on the premises on one occasion.  *See McMillian v. State*, 600 A.2d 430, 441–42 (Md. 1992).

The excised application contains facts supporting probable cause to believe that both plaintiffs were aware of the nature of the business's operations and that both plaintiffs maintained Mid Atlantic Wellness for the purpose of unlawful controlled substance distribution.  Delavega was the owner.  Although Niewenhous was not an owner, her critical role as the only licensed prescriber suffices to establish probable cause that that she, too, was keeping the premises for purposes of unlawful drug distribution.

In sum, on the record before the Court, the undisputed facts show that there was probable cause to arrest plaintiffs.  Significantly, plaintiffs do not allege that the application, as written,

lacked probable cause.  *See* Niewenhous Compl. ¶¶ 20–21; Delavega Compl. ¶¶ 21–22.  Further, defendants have established that there is no genuine dispute that the challenged statements in the warrant application were neither intentionally false or misleading nor material to the probable cause finding.  Plaintiffs now contend that the application did not establish that Niewenhous herself was illegally distributing a controlled substance.  But, as discussed above, evidence that Niewenhous herself was illegally distributing a controlled substance was not necessary to the probable cause finding that she and Delavega maintained a common nuisance.  Because the undisputed facts demonstrate that there was probable cause to arrest plaintiffs, no reasonable jury could find that defendants violated plaintiffs' Fourth Amendment rights.  Thus, defendants are entitled to judgment as a matter of law on plaintiffs' § 1983 claims for violation of their Fourth Amendment rights based on false arrest, false imprisonment, and malicious prosecution (Counts I–III).[11]

### C.  Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally . . .  are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hicks v. Ferreyra*, No. PWG-16-2521, 2017 WL 1326532, at *3 (D. Md. Apr. 11, 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S.

---

[11] The Court need not reach defendants' argument that the preliminary hearing judge's ruling shows that the warrants were supported by probable cause. Defs.' Mem. 16, 21–22. In any event, the preliminary hearing judge's determination regarding probable cause is not dispositive here. *See Bryant v. Town of Bluffton*, No. 17-414-DCN-BM, 2019 WL 6176160, at *8 (D.S.C. June 14, 2019) ("[I]n assessing the existence of probable cause, whether an arrestee is ultimately found to be innocent on the criminal charge (or . . . the charges are eventually dismissed) is not determinative."), *report & recommendation adopted,* No. 17-414-DCN, 2019 WL 4439435 (D.S.C. Sept. 17, 2019).

800, 818 (1982))); *see Davis v. Prince George's Cty., Md.*, 348 F. App'x 842, 843 (4th Cir. 2009). This protection "is available for officers or agents who 'act in objectively reasonable reliance on existing law.'" *Hicks*, 2017 WL 1326532, at *3 (quoting *Queen v. Prince George's Cty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016)). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Id.* (quoting *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002)).

When deciding whether the doctrine of qualified immunity applies, the Court considers (1) "'whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right'" and (2) "whether the right at issue was 'clearly established' at the time of [the] alleged misconduct." *Davis*, 348 F. App'x at 844 (quoting *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)); *Hicks v. Ferreyra*, 965 F.3d 302, 307 (4th Cir. 2020). Courts have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in [a] particular case . . . ." *Davis*, 348 F. App'x at 844 (quoting *Pearson*, 555 U.S. at 236). "A rule is 'clearly established' when existing appellate precedent 'placed the statutory or constitutional question beyond debate' so that it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Schloss v. Lewis*, No. JFM-15-1938, 2016 WL 1451246, at *4 (D. Md. Apr. 12, 2016) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)), *aff'd sub nom. Schloss v. Abey*, 691 F. App'x 710 (4th Cir. 2017). If the officer demonstrates that the conduct in question did not violate a clearly established constitutional right, then the officer has qualified immunity from liability in the civil suit. *Id.* The burden lies with the defendants to prove qualified immunity. *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013); *Hicks*, 2017 WL 1326532, at *3.

"The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Robinson v. Miller*, 802 F. App'x 741, 748 (4th Cir. 2020) (quoting *Brooks v. City of Winston–Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996)). In addition, "the Constitution [does] not permit a police officer deliberately, or with reckless disregard for the truth, to make . . . omissions to seek a warrant that would otherwise be without probable cause." *Osborne v. Georgiades*, 679 F. App'x 234, 239–40 (4th Cir. 2017) (quoting *Miller v. Prince George's Cty., Md.*, 475 F.3d 621, 631–32 (4th Cir. 2007) (collecting cases)). The right to be free from such transgressions by law enforcement was clearly established when plaintiffs were arrested. *See Robinson*, 802 F. App'x at 748; *Osborne*, 679 F. App'x at 239–40; *Miller*, 475 F.3d at 631–32; *Brooks*, 85 F.3d at 183. Indeed, "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, . . . the shield of immunity [will] be lost." *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (citation omitted). Therefore, qualified immunity will not protect defendants if they knew or should have known Detective Gore's warrant application did not show probable cause or only showed probable cause based on false or misleading statements, because it would not be reasonable for them to "believe [the] warrant [was] supported by probable cause." *Miller*, 475 F.3d at 632 (quoting *Smith v. Reddy,* 101 F.3d 351, 355 (4th Cir. 1996)); *see Hicks v. Anne Arundel Cty.*, No. JKB-20-22, 2020 WL 7624773, at *12 (D. Md. Dec. 22, 2020); *see also Osborne*, 679 F. App'x at 239–40.

On the record before the Court, the undisputed facts demonstrate that, contrary to plaintiffs' allegations, Detective Gore did not make intentionally false or misleading material statements in the warrant application and defendants did not arrest them without probable cause. Therefore,

plaintiffs cannot establish that defendants violated their right to be free from an unreasonable seizure.

Moreover, even if plaintiffs could show that defendants' conduct led to plaintiffs' arrest without probable cause because there was no evidence that Niewenhous herself was illegally distributing a controlled substance, it was not "clearly established" that a suspect's own distribution of a controlled substance was an element of keeping a common nuisance under Crim. Law § 5-605(a)(2). Plaintiffs have not identified any case law holding that an individual must distribute a controlled substance herself to be found guilty of Crim. Law § 5-605(a)(2). To the contrary, the Maryland courts repeatedly have found sufficient evidence to convict under § 5-605(a)(2) without evidence that the defendants themselves distributed a controlled substance. *E.g.*, *McMillian*, 600 A.2d at 431–33, 440–42; *Pettiford*, 261 A.2d at 220; *Fitchett*, 2019 WL 1254177, at *6. And, in the foregoing discussion, this Court concluded that evidence that a suspect himself or herself distributed a controlled substance is not necessary for a finding of guilt under § 5-605(a)(2).

Further, if this were an element of Maryland law regarding keeping a common nuisance, it was not "clearly established" because this element would not have been clear to a reasonable officer. *See Schloss*, 2016 WL 1451246, at *4. "[I]n evaluating whether an objectively reasonable officer could have believed that probable cause existed to arrest [a suspect], a reviewing court should consider those efforts, the advice received, and the magistrate's confirming issuance of the warrants." *Rogers v. Stem*, No. 12-976 AJT, 2013 WL 3338651, at *7 (E.D. Va. July 2, 2013) (citing *Torchinsky v. Siwinski,* 942 F.2d 257, 263 (4th Cir. 1991)), *aff'd,* 590 F. App'x 201 (4th Cir. 2014); *see also Schloss*, 2016 WL 1451246, at *11. The Assistant State's Attorney's review of Detective Gore's report and the state judge's issuance of the warrants lend strong support to the

defendants' reasonable belief that there was probable cause to arrest plaintiffs.  *See Schloss*, 2016 WL 1451246, at *10–11 (noting that the defendant officer "confirmed and corroborated his fellow officer's report regarding Schloss, submitted his application for approval to two prosecutors . . . and a neutral magistrate judge approved the warrant application" and concluding that "even if [the officer] did not have probable cause to apply for the warrant, he [was] entitled to qualified immunity" because he "was not 'entirely unreasonable' in believing that he had probable cause to apply for a warrant"); *Rogers*, 2013 WL 3338651, at *7; Gore Decl. ¶ 5, ECF 27-3; Warrants, ECF 27-4.  Thus, even if the common nuisance statute were interpreted as plaintiffs argue, such an interpretation was not clearly established at the time of plaintiffs' arrests,  and defendants are entitled to qualified immunity.  *See id.*; *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995) ("[E]ven if there was a constitutional violation, the relevant Virginia case law suggests that the allegedly unconstitutional use of the 'race profile,' was *not* 'clearly established' at the time of the purported violation."); *Hicks*, 2017 WL 1326532, at *3; *Queen*, 188 F. Supp. 3d at 541.

### D.  State Law Claims

The Court has federal question jurisdiction over plaintiffs' § 1983 claims and supplemental jurisdiction over plaintiffs' state constitutional and common law claims.  28 U.S.C. §§ 1331, 1367(a).  "When a district court 'dismisse[s] all claims over which [it] enjoys original jurisdiction,' . . . , it 'may decline to exercise supplemental jurisdiction' over remaining state-law claims."  *McKinnon v. Gilmore*, No. PWG-17-1428, 2018 WL 2010301, at *5 (D. Md. Apr. 30, 2018) (quoting 28 U.S.C. § 1367(c)(3)).  The Court "enjoy[s] wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished."  *Id.* (declining to exercise supplemental jurisdiction over state law claims after dismissing § 1983 claims) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)).  Moreover, in the context

of § 1983 litigation, this Court has stated that its "duty . . . is to dismiss the ostensible federal claims and, in the absence of complete diversity of citizenship, to decline to exercise supplemental jurisdiction over plaintiffs' state-law claims." *Jones v. City of Frederick, Md.*, No. AMD-07-3010, 2008 WL 2509411, at *3 (D. Md. June 19, 2008) (noting that "[t]he Fourth Circuit [has] lamented, and not for the first time, frequent attempts to "constitutionalize" state-law claims that sound in negligence and/or gross negligence" (citing *Waybright v. Frederick County, Md.,* 528 F.3d 199, 209 (4th Cir. 2008)), *aff'd sub nom. Jones v. City of Frederick*, 301 F. App'x 291 (4th Cir. 2008); *see Waybright v. Frederick Cty., MD*, 528 F.3d 199, 209 (4th Cir. 2008) ("The upshot of our analysis is that this case is basically a state case gone awry.  With all its federal questions gone, there may be the authority to keep it in federal court under 28 U.S.C. §§ 1367(a) and 1441(c) (2000), but there is no good reason to do so.").  Because the Court dismisses the federal claims and there is no complete diversity of citizenship, the Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.

## **ORDER**

For the reasons stated in this Memorandum Opinion and Order, it is, this 31st day of March, 2021 hereby ORDERED that

1. Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, ECF 27, treated as a motion for summary judgment, IS GRANTED;

2. Summary Judgment IS ENTERED in defendants' favor on Counts I, II, and III of Niewenhous's Complaint and Delavega's Complaint;

3. The remaining counts of plaintiffs' complaints ARE DISMISSED for lack of jurisdiction;

4.     Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary

Judgment, ECF 28, treated as a motion for summary judgment, IS DENIED AS

MOOT; and

5.     The Clerk IS DIRECTED to close these cases.


_____/S/_____
Deborah L. Boardman
United States Magistrate Judge